ASHTON RYAN, JR.

VERSUS

MELINDA DOUCET

NO. 21-CA-32

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 790-717, DIVISION "C"
HONORABLE JUNE B. DARENSBURG, JUDGE PRESIDING

August 25, 2021

**FREDERICKA HOMBERG WICKER**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and Jude G. Gravois

<u>**AFFIRMED AS AMENDED REMANDED WITH INSTRUCTIONS**</u>
    **FHW**
    **SMC**
    **JGG**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Alexis Barteet
Assistant Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
ASHTON RYAN, JR.
Cesar R. Burgos
Robert J. Daigre
Gabriel O. Mondino
George M. McGregor
Leila M. Bonilla

COUNSEL FOR DEFENDANT/APPELLANT,
MELINDA DOUCET
Bailey D. Morse

**WICKER, J.**

Plaintiff-tenant, Melinda Doucet, appeals the September 8, 2020 trial court judgment in favor of defendant-landlord, Ashton Ryan, in the amount of $141,320.47 for past due rental payments, property taxes, and insurance premiums due pursuant to a Lease Agreement executed between the parties, which also contained an Option to Purchase the leased property. Because we find that the judgment improperly awarded Mr. Ryan monetary damages for his prescribed reimbursement claims for taxes and insurances paid pursuant to the Lease for the years 2003-2007, we amend the trial court judgment to reduce the award by $11,232.66. In all other respects, we affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

This litigation arises out of an unusual set of facts surrounding a Lease Agreement executed between the parties. On August 23, 2002, Ms. Doucet and Mr. Ryan executed a document titled "Lease Agreement" for a property owned by Mr. Ryan and located at 116 Imperial Woods in Harahan, Louisiana. The Lease Agreement—with a 30-year term—contained various provisions, including a "Purchase Option" provision. The Lease granted Ms. Doucet the option to purchase the property "for the initial price of $170,000.00" and set forth that "all principal payments shall be forfeited by Tenant should Tenant fail to properly exercise the purchase option."

The Lease Agreement was introduced into evidence and provided that Ms. Doucet would pay an "initial installment of $50,000.00 at lease inception and thereafter in equal monthly installments of $1,131.00…payable without deduction, set off, or demand, a percentage of said amount being applied to principal should Tenant exercise the option to purchase... ." The Lease also contained a provision stating that Mr. Ryan would be responsible for initial payment of all insurances and taxes on the property; however, the Lease stipulated that, upon demand, Ms.

Doucet would reimburse Mr. Ryan for property taxes and insurances paid.[1] The Lease additionally provided for a five-percent late fee or penalty should the monthly rental payments not be made by the 15th of each month. On December 10, 2002, the parties executed an "Addendum to Lease Agreement," which acknowledged that "the property is encumbered by a mortgage in favor of Hibernia National Bank in the approximate amount of $80,000.00" and that "Lessor will not further encumber or otherwise alienate, in whole or in part, the subject property without the express written consent of Lessee." The Addendum further stated that "Lessee shall have the right to exercise the purchase option at any time."

Concerning cancellation, the Lease contained a provision titled "Defaults and Remedies" which provided that under certain circumstances, including "if tenant shall fail to keep and perform each and every covenant condition and agreement herein…," then, "at the sole option of the Landlord, Tenant's right of possession shall thereupon cease and terminate, and Landlord shall be entitled to the possession of the Property and to remove all persons and property therefrom and to reenter the same without further demand of rent or demand of possession of said Property… ." The Lease further provided for the Landlord's right to reimbursement of attorney fees incurred in attempting to collect rent or secure possession of the property upon Tenant's default.

On December 26, 2018, Mr. Ryan filed a "Petition for Eviction, Declaratory Judgment, Breach of Lease and Damages," seeking damages totaling $205,934.99 in past due rental payments, including a 5% late fee on the past due rental payments, as well as reimbursement for taxes and insurances paid pursuant to the Lease. The petition alleged that Ms. Doucet ceased making full rental payments in October 2008, at which time she made a few partial rental payments through July

---

[1] The Lease provided that Ms. Doucet would only be responsible to reimburse the taxes "to the extent that such taxes exceed the homestead exemption allowance." The parties submitted a joint exhibit setting forth the agreed-upon amounts of reimbursable taxes paid under the Lease.

2012. The petition further alleged that Ms. Doucet ceased making any rental payments whatsoever from July 2012 through the date of the filing of the petition—December 26, 2018.

Ms. Doucet thereafter filed an Answer with various exceptions, including an exception of prescription as to the alleged past-due rental payments, contending that any payments allegedly owed beyond a three-year period from the date of demand were prescribed as a matter of law. In her answer, Ms. Doucet claimed that she learned Mr. Ryan placed an additional mortgage on the property in 2007, which she alleged was in violation of the Lease Addendum and could have affected her ability to obtain clear title to the property. Ms. Doucet further alleged that Mr. Ryan failed to request rental payments or reimbursement of any taxes or insurances paid, and that the parties' actions during the length of the lease resulted in a modification of the terms of the Lease such that Mr. Ryan, by his silence or inaction, waived his right to assert claims for unpaid rent or other obligations under the Lease.

With her answer, Ms. Doucet further asserted a reconventional demand against Mr. Ryan[2] seeking reimbursement for nearly $200,000.00 she alleged she expended in improvements to the property, which she described as being in "deplorable" condition at the time of the execution of the Lease. Ms. Doucet further sought specific performance of the Purchase Option under the Lease, seeking title to the property at issue.

Mr. Ryan subsequently filed a "Motion for Summary Judgment on Issue of Lease versus Lease Purchase Agreement and Ms. Doucet's Default," requesting the trial court make a determination that the contract between the parties is a lease agreement with an option to purchase provision, rather than a lease-purchase

---

[2] The reconventional demand also named Mr. Ryan's wife, Mrs. Jolene Favalora Ryan, as a defendant-in-reconvention.

contract.  On May 14, 2019, the trial court rendered a judgment holding that the Lease agreement at issue is a "lease agreement with the option to purchase."[3]

On March 11, 2020, the trial court issued a judgment, sustaining Ms. Doucet's exception of prescription in part, finding that "the rental arrearages and late payments asserted before November 2, 2015 are prescribed" and further that "ten year liberative prescription applies [to] all remaining balances, such as the insurances and taxes."[4]

The matter proceeded to a bench trial on June 15 and June 24, 2020.  At trial, Mr. Ryan testified that he purchased the property at issue from his parents in 1983, and that he had not been to the home since his mother and siblings lived there in 1999. When questioned how he became acquainted with Ms. Doucet, he stated that he believed Ms. Doucet knew Mr. John Lapworth, a contractor who built a home for Mr. Ryan in or around 2000, and that Mr. Lapworth approached him about Ms. Doucet purchasing the home.  He testified that his initial intent was not to sell the home but Ms. Doucet asked for an option to be able to buy the house "if at some point in time her economic and credit fortunes got better." Mr. Ryan agreed to that.

Mr. Ryan testified that he, Ms. Doucet, and his then-attorney Greg St. Angelo met to execute the Lease agreement.  He testified that all parties carefully reviewed the agreement drafted by Mr. St. Angelo, as evidenced by the fact that certain portions of the Lease Agreement had been scratched out and initialed as amended.

Concerning Ms. Doucet's rental payment history, Mr. Ryan testified that Ms. Doucet paid the initial $50,000.00 installment, which he testified was pre-paid

---

[3] That judgment is not at issue in this appeal. Mr. Ryan subsequently filed a motion for summary judgment as to the issues of "Breach and Default and Non-Exercise of Option to Purchase by Defendant, Ms. Doucet," which was subsequently denied.  That issue is not before this Court on appeal.
[4] That judgment is not challenged in this appeal.

rent that enticed him to agree to lease the property and was a beneficial requirement to allow Ms. Doucet a lower monthly rental payment; she thereafter made timely and full payments for approximately 18 months. He testified that, thereafter, Ms. Doucet would make intermittent payments and, at times, would skip a few months and then write a larger check to catch up. On two occasions, he asked his attorney, Mr. St. Angelo, to contact Ms. Doucet to inquire about the status of her rent payments. Mr. Ryan testified that, during that time frame, Ms. Doucet had three young children and he was not interested in evicting her but wanted to inquire as to her plans to catch up on rental payments. He testified that Ms. Doucet would make promises as to either her father's intents to help get her caught up on rent, or that she was awaiting inheritance or additional money from other sources. He testified that the last payment he received was in July 2012, and that Ms. Doucet resided in the house but had not made one rental payment in approximately eight years.[5]

Mr. Ryan testified that, at the time the Lease was executed, the house was encumbered with an $80,000.00 mortgage with Hibernia National Bank. In 2007, after the "mini perm" loan matured, Hibernia would not renew the loan and he had to renew the loan at Omni Bank, who would approve him. He testified that the Omni (now Iberia) Bank loan was for a total amount of $65,000.00, less than the prior $80,000.00 Hibernia mortgage loan. Mr. Ryan testified to his opinion that the $65,000 mortgage was not in breach of the Lease Addendum because it did not further encumber the property and, in fact, was a lower amount of debt encumbering the property than at the time the lease was executed. Further, he

---

[5] Mr. Ryan testified, "even though they weren't done on a timely basis, I really didn't do anything because it was -- she was on schedule for eighteen months. That took us from '02 to about '04, middle of '04. And we all know what happened in '05; so as a result of Katrina, I didn't pursue the payments being four or five months skipped and then all of a sudden brought up. After that time frame, we went to a time frame where there was two years and nine months of no payments; and then I asked a lawyer to talk to her about getting a more payment steady approach. And she indicated to the lawyer that her father was expected to come in to some significant money from a business transaction. And she would be able to bring the lease current."

testified that Ms. Doucet never confronted him about the mortgage or indicated that the $65,000.00 mortgage on the property was her reason for non-payment of rent.

Mr. Ryan testified that he paid the Parish and City of Harahan taxes for the property, with the exception of one year when he did not receive a notice of taxes and later found out that Ms. Doucet had paid the taxes that year. Mr. Ryan also testified that he paid all insurances on the property during the Lease. The parties stipulated to the amount of taxes and insurances paid during the Lease.

At some point after he retired in 2017, Mr. Ryan retained counsel to attempt to "put [the property] in commerce" and get a paying tenant for the property to derive a steady income source. On March 9, 2018, he forwarded a "Notice to Vacate and Demand Letter" to Ms. Doucet by certified mail, putting her on notice that she had breached the terms of the Lease and asking her to vacate the premises within five days. He further outlined the past-due rental payments as well as the taxes and insurance reimbursements due pursuant to the terms of the lease, totaling $226,711.98. When asked why he didn't push the issue of past due rental payments or insurances sooner than the 2018 eviction notice, Mr. Ryan testified that he was a very busy businessman buying banks and working until 8:00 p.m. or later each night. He testified that he owns multiple properties and, "from an income standpoint, it was a thousand bucks. And it adds up to a lot of money over time when you don't pay a long time. But it was not a very significant amount to my lifestyle at that point in time. And, thirdly, it was Melinda's kids" who at that time were growing up in the house and he trusted that she would get caught up.

Melinda Doucet testified at trial that she met Mr. Ryan through a mutual acquaintance, John Lapworth, the contractor who was hired to do some work at Mr. Ryan's personal home in Kenner. She testified that Mr. Lapworth also did some work at the Imperial Woods house, the property at issue, for Mr. Ryan. Ms.

Doucet testified that she had recently received a $50,000.00 community property settlement and was going through a divorce, and Mr. Lapworth asked her if she would be interested in buying the Imperial Woods property. Ms. Doucet testified that, at the time she executed the Lease, the property had been vacant for approximately three years and was in "deplorable" condition.

She had only one meeting with Mr. Ryan prior to execution of the lease agreement. She testified that, at that time, she asked if Mr. Ryan would be interested in a bond for deed contract, and he replied that he was not interested in executing a bond for deed but would be agreeable to a long term lease with an option to purchase.

She testified that she made many improvements to the property prior to moving in. She estimated that she spent approximately $135,000.00 in improvements to the home. She testified she put up fencing and millwork on the exterior of the home and invested approximately $14,000.00 in flooring, $6,200.00 in plumbing repairs, $18,200.00 on kitchen cabinets, $4,200.00 for kitchen countertops, $6,000 for appliances, and $6,800.00 on the HVAC system, as well as other renovations to the interior of the home. However, when asked to verify those improvements or money spent, Ms. Doucet testified that she did not have any invoices, receipts, or photos to support her position that she had improved the home significantly.

She testified that Mr. St. Angelo prepared the Lease Agreement and an Amortization Schedule, which she testified was a reflection of the balance she would have to pay on the option to purchase based on the length of time passed and number of lease payments she made.

She testified that she discovered Mr. Ryan allegedly placed a second mortgage on the property in 2007, which is why she began withholding rental payments. She acknowledged that she did not confront Mr. Ryan or contact him

about the alleged second mortgage, but rather simply decided to withhold rental payments. She testified that she "panicked" and didn't know how to broach the subject with Mr. Ryan. On cross-examination, she acknowledged that in her deposition testimony to a similar question, her response as to why she did not make payments after 2007 was that she "could not think of a specific reason" and further that her "income was slim." Counsel further pointed out that the mortgage she referenced was not executed until November of 2007, but that she stopped making payments prior to November 2007. She further testified that she never contacted Hibernia Bank, Omni Bank, Mr. St. Angelo, or Mr. Ryan to inquire how, if at all, the alleged mortgage would affect her ability to exercise her option to purchase the property.

Ms. Doucet acknowledged that she did not make lease payments in accordance with the Lease agreement. She stated however that between 2007 and 2015, neither Mr. Ryan nor anyone on his behalf sent any written demand for payment or contacted her to inquire about her failure to pay. She stated that she never spoke to Mr. Ryan about her failure to pay, and that he never informed her that he would start enforcing the terms of the Lease. She further testified that she made several late payments, and was never asked to pay a 5% late fee or penalty as provided for in the Lease. She did recall speaking with Mr. St. Angelo in approximately 2015. She stated that she told Mr. St. Angelo that she was anticipating receiving an inheritance in the near future and that she intended to exercise her option to purchase the home when she received the inheritance. She testified that she received no further correspondence or communication indicating that she would be required to make lease payments until the March 9, 2018 letter stating that she was in default and purporting to terminate the Lease.

Ms. Doucet testified that she cared for an elderly woman, Ms. Carmen Miller, who donated her home in River Ridge to Ms. Doucet in 2015 and that Ms.

Doucet owned that property at the time of trial. She further testified that Ms. Miller planned to leave everything to Ms. Doucet upon her death. Ms. Doucet acknowledged that from the time she received her anticipated inheritance in late 2016 until Mr. Ryan forwarded the March 9, 2018 letter terminating the lease, she never contacted Mr. Ryan or anyone on his behalf to exercise her option to purchase the home.[6] She further acknowledged that she did not make any monthly lease payments after she received her inheritance.

Concerning the taxes and insurances paid on the property, Ms. Doucet testified to her understanding that she was paying a 7% interest on the property within her lease payments. She pointed to the "Amortization Schedule"[7] that was conducted at the same time as the Lease was executed. It was her understanding that the Lease payments would cover the taxes and insurance on the property, and that she would not be separately responsible for the taxes or insurance. She testified that Mr. Ryan never requested reimbursement for any taxes or insurance he paid on the property. Further, she testified that in 2018, she received a "Notice of Tax Sale" on the front door of her home, indicating that the City and Parish taxes for the previous year had not been paid.[8]

On April 9, 2018, in response to Mr. Ryan's March 9, 2018 letter, Ms. Doucet's counsel forwarded correspondence to Mr. Ryan's counsel stating that Mr. Ryan's inactions prohibit him from strictly enforcing the terms of the Lease agreement and further making an offer of $50,000.00 as a "good faith, down payment…to secure the option, with the remainder of the purchase price to be paid

---

[6] Once questioned about the fact that she did not make any monthly lease payments after late 2016, Ms. Doucet testified that she may not have received the inheritance until 2017.

[7] The Amortization schedule reflects 30 years of timely payments to reflect the remaining balance that would be due at any time, should Ms. Doucet exercise her option to purchase. For each $1,131,49 payment, it reflects $978.08 in interest and $183.41 toward the principal. Mr. Ryan, with FirstNBC Bank, testified that he provided this schedule as an example for Ms. Doucet to understand the balance due at any time she decided to exercise her option to purchase the property. The Amortization Scheduled does not reference insurance or taxes.

[8] Ms. Doucet testified that at some point, Mr. Ryan's wife contacted her asking for permission to have an insurance adjuster come to the property to reassess insurances.

to Mr. Ryan upon her securing financing." On September 18, 2018, Ms. Doucet's counsel forwarded correspondence to Mr. Ryan's counsel offering to purchase the property for $170,000.00 and formally "exercising the option to acquire the property for $170,000.00."

Kenneth Little, Ms. Doucet's father, testified at trial that he recalled the property at issue appearing "unlivable" at the time his daughter began leasing the home. He testified that he and other family members worked on the home for a period of time to make it livable for Ms. Doucet. He indicated that he spent some money toward improvements on the home, but could not provide an exact amount. He indicated that he never knew if his daughter purchased the home or leased the home from Mr. Ryan.

On September 8, 2020, the trial court issued the judgment on appeal, finding that the Lease between the parties terminated on March 9, 2018, and awarding damages in the amount of $141,320.47 in favor of Mr. Ryan and against Ms. Doucet ($84,352.58 in past due rent, $1,501.45 in property taxes, and $73,958.44 in insurances). The judgment further granted in part Ms. Doucet's reconventional demand, finding she is entitled to a credit in the amount of $18,492.00 for rent paid.[9] The judgment further ordered that Ms. Doucet vacate the premises at 116 Imperial Woods.

Ms. Doucet has suspensively appealed the trial court's September 8, 2020 judgment. On appeal, Ms. Doucet asserts that the trial court erred in finding that the Lease was properly terminated on March 9, 2018, and in failing to find that Ms. Doucet timely exercised her option to purchase the property. Ms. Doucet further contends that the trial court erred in awarding Mr. Ryan damages in the amount of $141,320.47, asserting that under the facts of this case, various equitable doctrines,

---

[9] The judgment dismissed with prejudice all remaining claims of Ms. Doucet's reconventional demand and stated that the judgment is a final and appealable judgment.

including laches and abuse of rights, should apply. Finally, Ms. Doucet contends that the trial court erred in dismissing her reconventional demand and in failing to award her damages for improvements she alleges she made to the property.

Mr. Ryan has filed an Answer to the appeal, contending that the trial court erred in failing to award attorney's fees pursuant to the Lease agreement. For the following reasons, we affirm the trial court judgment insofar as it awards past due rental payments, taxes, and insurances, but amend it to delete the reimbursement of taxes and insurances paid for the years 2003-2007, which the trial court previously determined had prescribed. We further find that the trial court erred in failing to award reasonable attorney fees as set forth in the Lease agreement, and remand this matter to the trial court for a determination of that issue.

## DISCUSSION

A lease is a synallagmatic contract by which one party, the lessor, binds himself to give to the other party, the lessee, the use and enjoyment of a thing for a term in exchange for a rent that the lessee binds himself to pay. La. C.C. art. 2668. The essential elements of a lease are the thing, the price, or rent, and consent of the parties. *Bayou Fleet P'ship v. Phillip Fam., LLC*, 11-924 (La. App. 5 Cir. 3/27/12), 91 So.3d 1112, 1115. The Civil Code sets forth that if a lessee fails to pay rent, the lessor may dissolve the lease in accordance with the law. La. C.C. art. 2704. An option to buy is a contract whereby a party gives to another the right to accept an offer to buy a thing within a stipulated time. An option must set forth the thing and the price, and meet the formal requirements of the sale it contemplates. La. C.C. art. 2620.

An option is nothing more than an elective right that, when exercised, ripens into a binding contract to buy and sell. *Monroe Real Estate & Development Co., Inc. v. Sunshine Equip. Co. Inc.,* 35,555 (La. App. 2 Cir. 1/23/02), 805 So.2d 1200, 1203; *Major Commodity Corp. v. Cunningham,* 555 So.2d 525, 527 (La. App. 4

Cir. 1989). In order to invoke a sale under an option to buy, not only must the option to buy be evidenced by a written instrument but the unqualified acceptance thereof must be evidenced in writing, giving full recognition and in accordance with the terms and conditions of the proposal, and formally exercised and tendered to the proposer prior to the expiration date of the stipulated time. *Rushing v. Glover*, 46,980 (La. App. 2 Cir. 4/11/12), 91 So.3d 1169, 1172, *writ denied*, 12-1071 (La. 9/12/12), 98 So.3d 310.

On appeal, Ms. Doucet first argues that the March 9, 2018 notice to vacate the premises was "premature" and could not operate to terminate the parties' Lease Agreement because "prior to March 2018, Ryan neither demanded payment of the monthly rental installments, insurance premiums nor property taxes in strict compliance with the terms of the Agreement." On appeal, Ms. Doucet argues that because Mr. Ryan did not strictly enforce collection of rent, he was required to first place her on notice that he intended to strictly enforce the terms of the Agreement, i.e., begin collecting rent, before he could terminate the Lease.

In support of her argument, Ms. Doucet cites *Housing Authority of Town of Lake Providence v. Allen*, 486 So.2d 1064 (La. App. 2 Cir. 1986) and *Housing Authority of St. John the Baptist Parish v. Shepherd*, 447 So.2d 1232, 1235 (La. App. 5 Cir. 1984), which held that "where a lessor customarily accepts rental payments after the date on which they are due, such 'custom' by acquiescence of the parties has the effect of altering the original contract with respect to punctuality of rent payments." While we agree that routine acceptance of late lease payments may waive the right to hastily evict for a tenant's failure to timely pay, the jurisprudence reflects that this principle does not apply to non-payment of rent. *See O'Keefe v. Breaux Mart Gen. Meyers, Inc.*, 499 So.2d 598, 602 (La. App. 5 Cir. 1986), *writ denied*, 503 So.2d 22 (La. 1987). This Court has found that a "lessor's silence or inaction does not waive his right to receive the rent due." *Id.*

We find it absurd to hold that Mr. Ryan was required to notify Ms. Doucet that he intended to begin *collecting rent* before he could terminate the Lease after eight years of nonpayment. Whether there is an oral agreement that modified a written contract is a question of fact and we cannot say that the trial court's factual determination that the parties did not modify the Lease by their actions or inactions was manifestly erroneous. *Wechem, Inc. v. Evans,* 18-743 (La. App. 5 Cir. 5/30/19), 274 So. 3d 877, 888, *writ denied*, 19-01176 (La. 10/15/19), 280 So.3d 600. This assignment of error has no merit.[10]

Ms. Doucet next contends that the trial court erred in ordering her to vacate the property and in failing to find that she timely exercised her option to purchase the property. In support of her argument, Ms. Doucet points to the provision in the Lease Addendum which provides that she can exercise her option to purchase the property "at any time." Therefore, she asserts that either her April 2018 letter, wherein she offered to pay a "good faith" $50,000.00 deposit and to pay the remainder at a later date upon obtaining financing, or her September 18, 2018 correspondence wherein her counsel specifically states, "my client is exercising the option to acquire the property for $170,000[,]" is sufficient to exercise her option to purchase.

First, the "at any time" language contained in the Lease Addendum is prohibited by law. The "Louisiana Civil Code requires that an option must state a stipulated time within which it must be exercised." *Mayne & Mertz, Inc. v. Quest Expl., L.L.C.*, 401 Fed. App'x 871, 873 (5th Cir. 2010), citing La. C.C. art. 2620,

---

[10] For the same reasons, we find Ms. Doucet's claims under the discretionary judicial equitable doctrines of laches and abuse of rights are without merit. The abuse of right doctrine and other equitable doctrines are applied in very limited circumstances. Cases which have applied judicial control of leases generally involve circumstances where a lessee had made a good faith error and acted reasonably to correct it. See *Carriere v. Bank of La.,* 95–3058 (La.12/13/96), 702 So.2d 648, 655 (holding that the judicial control is an equitable doctrine by which the courts will deny cancellation of the lease when the lessee's breach is of minor importance, is caused by no fault of his own, or is based on a good faith mistake of fact). We find that Ms. Doucet, who failed to pay any rental payments under the lease for a period of more than eight years, cannot seek relief under these equitable doctrines.

cmt. (c) ("Under this Article, an option for a perpetual or indefinite term is null."). Second, we find that although the "at any time" language could be interpreted to mean at any time during the term of the Lease, we find no error in the trial court's determination that the Lease at issue terminated on March 9, 2018, prior to Ms. Doucet's attempt to exercise her option. Thus, we find no error in the trial court's determination that any subsequent offer to purchase the property was untimely.

Ms. Doucet next contends that the trial court erred in awarding the total amount of $141,320.47 in damages ($84,352.58 in past due lease/rent payments, $1,501.45 in property taxes, and $73,958.44 in insurances). First she complains that the $84,352.58 in past due rental payments should be reduced, asserting that the parties stipulated to the amount of $66,531.61 as of the date of trial. We find this argument lacks merit. Although the record reflects that at the conclusion of trial, the parties informed the trial judge that they had "prepared jointly an Excel spreadsheet that weighed out the insurance payments and the tax payments," there was no such stipulation on the record or any joint statement presented concerning the past due rental payments. The record reflects that the stipulated amounts were to insurance and taxes only, as the invoices and bills introduced into evidence were not all legible. This assignment of error lacks merit.

Concerning past due rental payments, the trial judge's calculations for past due rent are those set forth in Mr. Ryan's post-trial memorandum, which limits the claim to three years prior to the demand. The accepted calculations total $34,453.84 for past due rent from November 2, 2015, through March 31, 2018.[11] After the date of termination of the lease in March 2018, the total outstanding rental obligation from April 1, 2018 through date of trial totals $49,898.71. The trial court applied the "Tenant Holding Over Provision" in the Lease, which

---

[11] Mr. Ryan's calculations provided: $1,131.49 rent+ $56.57 late fee =$1,188.06 x 29 months from November 2015 through March 2018.

provided that should the tenant fail to surrender possession of the property after termination of the lease, the month-to-month rental payments would be 150% of the monthly payment under the Lease. Given that the undisputed testimony at trial reflects that Ms. Doucet failed to surrender possession of the property after termination of the Lease through the date of trial and continued to fail to make any rental payments during that time frame, we find no error in the trial court's application of this Lease provision.[12] Accordingly, we find no error in the trial court's calculation of past due rental payments.[13]

As to insurance and tax reimbursements, Ms. Doucet contends that the trial court erred in awarding reimbursement for all taxes and insurances paid by Mr. Ryan since lease inception, where the court previously sustained her exception of prescription as to reimbursement claims more than ten years prior to date of demand. This argument has merit. The trial court previously sustained Ms. Doucet's exception of prescription as to Mr. Ryan's reimbursement claims, finding that such claims were subject to a ten-year prescriptive period. Accordingly, we find that the trial court erred in awarding Mr. Ryan the amounts paid in taxes or insurances for the years 2003-2007, more than ten years from the date of demand. We therefore amend the judgment to award Ms. Doucet a $8,312.83 credit as to the insurance reimbursement claim and a $2,919.83 credit as to the tax reimbursement claim, reducing the total amount of damages by $11,232.66. The judgment is hereby amended to reflect a total award of $130,087.81, subject to the $18,492.00 credit the trial court granted to Ms. Doucet for prepaid rental payments and not challenged on appeal.

---

[12] The calculations provided by Mr. Ryan for the time period after termination of the Lease is as follows: $1,188.06 total monthly rental obligation x 150% = $1,782.10 x 28 months.

[13] We further find no error in the trial court's decision not to apply any credit for Ms. Doucet's initial installment payment of $50,000.00 under the Lease toward her past due rental payments. Mr. Ryan testified that the $50,000.00 payment enticed him to offer the option to purchase and the Lease specifically provides that the Tenant forfeits all payments should Tenant fail to timely exercise her option to purchase.

Finally, Ms. Doucet contends that the trial court erred in dismissing her reconventional demand and in denying her reimbursement claim for alleged improvements made to the property. In her reconventional demand, Ms. Doucet alleged that she invested nearly $200,000.00 in improvements to the property at issue. At trial, Ms. Doucet testified that the property was in "deplorable" condition at the time the parties executed the Lease and that she made various improvements to the property that she estimates cost her more than $135,000.00. She testified that she renovated the kitchen to install new cabinetry, countertops, and appliances, as well as performed other renovations to the plumbing system and other improvements. However, at trial, Ms. Doucet did not introduce into evidence any invoices or receipts for materials or work performed on the property. She failed to introduce any photographs into evidence to show the condition of the home at the inception of the Lease or at the time of trial, easily available to Ms. Doucet who was still living in the home at the time of trial. Based on the lack of evidence presented concerning Ms. Doucet's reimbursement claims for alleged improvements made to the property, we cannot say that the trial court was manifestly erroneous in dismissing those claims.

**ANSWER TO THE APPEAL**

Mr. Ryan has filed an Answer to the appeal, contending that the trial court erred in failing to award attorney fees to the prevailing party, as provided for in the Lease contract. The Lease at issue provides: "Tenant expressly agrees to reimburse Landlord for any expenses, including counsel fees, Landlord may incur in enforcing the latter's rights against Tenant under this lease, including, but not limited to, the collection of rent and the securing of possession [] of the Property." We find this argument has merit and we remand this matter to the trial court for a hearing to determine an award of reasonable attorney fees in this case.

**DECREE**

For the reasons provided herein, we affirm the trial court judgment awarding Mr. Ryan's claims for past due rental payments in addition to his reimbursement claims for paid taxes and insurances as provided for in the Lease executed between the parties. Because we find the trial court erred in awarding reimbursement for taxes and insurances paid from 2003-2007, previously determined to be prescribed, we amend the judgment to reflect an additional credit of $11,232.66 to Ms. Doucet.[14] In all other respects, the trial court judgment is affirmed and this matter is remanded to the trial court for determination of reasonable attorney fees.

**AFFIRMED AS AMENDED;**
**REMANDED WITH**
**INSTRUCTIONS**

---

[14] This is in addition to the $18,492.00 credit awarded in the September 8, 2020 judgment to Ms. Doucet for prepaid rental payments.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN S. BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **AUGUST 25, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

# 21-CA-32

**E-NOTIFIED**

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE JUNE B. DARENSBURG (DISTRICT JUDGE)
GABRIEL O. MONDINO (APPELLEE)          GEORGE M. MCGREGOR (APPELLEE)          ROBERT J. DAIGRE (APPELLEE)
BAILEY D. MORSE (APPELLANT)

**MAILED**

LEILA M. BONILLA (APPELLEE)            CESAR R. BURGOS (APPELLEE)
ATTORNEY AT LAW                        ATTORNEY AT LAW
3535 CANAL STREET                      3535 CANAL STREET
NEW ORLEANS, LA 70119                  SUITE 200
                                       NEW ORLEANS, LA 70119